CHIEF INDUSTRIES, INC., APPELLEE, V. HAMILTON COUNTY BOARD OF EQUALIZATION, APPELLANT.
422 N.W.2d 324

Filed April 21, 1988.   No. 86-059.

Michael J. Owens, Hamilton County Attorney, for appellant.

Norman H. Wright of Fraser, Stryker, Veach, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for appellee.

BOSLAUGH, CAPORALE, and GRANT, JJ., and RIST and CLARK, D. JJ.

CLARK, D.J.

This is an action on appeal from a finding of the Hamilton County Board of Equalization (hereinafter board), regarding the 1984 real property tax assessment of the taxpayer, Chief Industries, Inc. (hereinafter Chief). Chief owns and operates a trailer-manufacturing facility consisting of seven buildings located in Hamilton County near the city of Aurora. For tax year 1984, the Hamilton County assessor found the actual value of Chief's property to be $1,608,125. Chief appealed to the board on the bases that the valuation was set too high and that it was not equalized with other real property in Hamilton County, particularly agricultural land. The board affirmed the

assessor's action, and Chief appealed to the district court.

Although Chief's appeal was premised on both theories presented to the board, at trial Chief conceded that its property was assessed at actual value and based its argument only on the issue of failure of the assessor to equalize the assessment with those on agricultural land in Hamilton County. Initially, at the board level, Chief sought a reduction to $1,206,093, i.e., a 25-percent reduction. However, after introduction of evidence at the district court trial, Chief was granted leave to amend its prayer to request a reduction of actual value to not greater than $737,808. The board cross-appealed to the district court, seeking an increase in the assessor's valuation.

At trial the district court determined that the actual value of Chief's property as of January 1, 1984, was $1,608,125, as determined by the assessor. The district court further found that the board had systematically valued agricultural land in Hamilton County at 50 percent of its actual value for taxation purposes and that the valuation of Chief's property must be equalized with the values of other real property in Hamilton County. The district court accordingly ordered that the valuation of Chief's property for 1984 be set at $804,062, and found that all taxes levied and/or collected on assessed values exceeding that figure were illegally levied and collected, were a denial of equal protection, and were ordered refunded.

On appeal, the board makes five assignments of error, which may be summarized as follows: (1) The court erred in allowing Chief to amend its petition at trial to reflect a request for a reduction in valuation of its property to an amount less than that originally stated in its protest filed before the board of equalization; (2) the court erred in allowing Chief to present evidence (a study conducted by William Fischer) which Chief had failed to disclose to the board in pretrial discovery; and (3) the court erred in finding that the board had failed to equalize the valuation of Hamilton County property and in reducing the assessment of Chief's property to 50 percent of its actual value.

We first note that an appeal from the district court concerning action by a county board of equalization is heard as in equity and reviewed de novo. *Kearney Convention Center v. Board of Equal.*, 216 Neb. 292, 344 N.W.2d 620 (1984);

*Fremont Plaza v. Dodge County Bd. of Equal.,* 225 Neb. 303, 405 N.W.2d 555 (1987). A taxpayer may question the assessed value (actual value) of its real estate, the lack of proportionate and uniform valuation of the property, or both issues, in a proceeding before a board of equalization. *Gordman Properties Co. v. Board of Equal.,* 225 Neb. 169, 403 N.W.2d 366 (1987); *Fremont Plaza v. Dodge County Bd. of Equal., supra.*

"Neb. Rev. Stat. § 77-1511 (Reissue 1986) restricts a taxpayer's appeal to a consideration of questions raised before the board of equalization, and the court is without power to adjudicate any other *factual* question or issue in the taxpayer's appeal." (Emphasis supplied.) (Syllabus of the court.) *Gordman Properties Co. v. Board of Equal., supra.*

The board cites *Nebraska Telephone Co. v. Hall County,* 75 Neb. 405, 106 N.W. 471 (1906), in support of its claim that Chief should not have been allowed to amend the dollar amount of relief sought. In that case, the taxpayer argued excessive valuation to the board based on capitalization of gross receipts. In the district court, the taxpayer argued that the use of pole value multipliers was erroneous because the pole count was incorrect. We held that the latter issue was not raised before the board and could not be raised in district court. Other cases have used a similar rationale. See *Reichenbach Land & Loan Co. v. Butler County,* 105 Neb. 209, 179 N.W. 1015 (1920), where the taxpayer failed to argue before the board but argued in district court that the value of bank stock and shares was not assessable at all. See, also, *Reimers v. Merrick County,* 82 Neb. 639, 118 N.W. 113 (1908), where the taxpayer argued before the board that the property in question was acquired after the assessment date, and in district court argued that the assessment statute was unconstitutional. Also, in *Gordman Properties, supra,* the taxpayer had consolidated appeals for the years 1983 and 1984. In the 1983 hearing, the issue before the board was based solely on the excessiveness of the assessment, but on appeal the taxpayer added the allegation that the value of its property had not been proportionately equalized with all other property. We held that this latter issue had not been presented to the board and therefore could not be

considered on appeal. The distinction, though, is that in these cases there was a different *issue* presented before the court than was presented to the board. In the instant case, the *issues* presented in district court were the same as presented to the board, i.e., the alleged overvaluation of Chief's property and the failure of the assessor to equalize the value of Chief's property with other real property in Hamilton County. There was no change of *issues*, merely a change in the level of economic relief sought. The board's contention in this regard is without merit.

In regard to the board's assignment of error relating to admission of evidence not disclosed in pretrial discovery, it is noted that the trial court, after first sustaining the objection, conducted an evidentiary hearing in this regard. This hearing disclosed considerable confusion between counsel as to whether Fischer's data had been made available to the board. Following this hearing, the court reversed its ruling and allowed the evidence to be introduced. An offer of continuance of trial was declined by the board. Trial courts have broad discretion with respect to sanctions involving discovery procedures. *Priest v. McConnell*, 219 Neb. 328, 363 N.W.2d 173 (1985); *Cardenas v. Peterson Bean Co.*, 180 Neb. 605, 144 N.W.2d 154 (1966). We cannot say the trial court abused its discretion in allowing this evidence to be admitted. Further, it would appear from the record that when the exhibit was reoffered, the board withdrew its objection. The board, therefore, cannot now be heard to complain of error in this regard.

At trial, Evelyn Zehr, the assessor for Hamilton County, was called as a witness for Chief. She testified that the method used to evaluate Chief's property was the Marshall Valuation Service manual, which was prescribed by the Nebraska Department of Revenue for use in valuing improvements, and that this publication was used uniformly throughout Hamilton County. Pursuant to the formula set out in this manual, she first arrived at new construction cost, then deducted depreciation. She also inspected the premises. Zehr found the actual value of Chief's property on January 1, 1984, to be $1,608,125.

Zehr further testified that the Nebraska Agricultural Land Valuation Manual was used exclusively for valuation of

unimproved agricultural land. This manual, also prescribed by the Nebraska Department of Revenue, used a valuation technique of capitalization of earnings based on yield production of various types of soil and the geographical location of the land.

Zehr was aware of a Department of Revenue study based on 21 arm's-length sales of unimproved agricultural land which indicated a sales-assessment ratio of 47.74 between the assessment of such agricultural land and comparable sales of such land; i.e., assessed values were at 47.74 percent of what the property sold for on the open market. There was no attempt by Zehr to correlate the land valuation manual process with the fair market value of unimproved agricultural property.

Chief also presented testimony by Dennis Donner, manager of technical services for the Nebraska Department of Revenue for 10 years. Donner holds a bachelor's degree in business administration and has completed specific educational courses in appraisal, valuation, and statistical analysis. He has testified in state and federal courts concerning the use and credibility of the sales-assessment ratio.

Donner testified that part of his duties is the compilation of the annual sales assessment study referred to by Zehr. He defined the sales assessment study as a "measure that measures selling price compared to assessed value by county by classification of property." The information relied on to compile the study is derived from forms sent in by county assessors on arm's-length transactions involving sales of real estate according to classifications of property and the actual selling price thereof. This study is used by the State Board of Equalization and Assessment for intercounty equalization.

Donner further testified that land values in the Nebraska Agricultural Land Valuation Manual set out specific dollar figures that are assigned to different land classification groups and that assessors are required to use these values according to the soil survey in their respective counties. He testified that his sales assessment study for Hamilton County was based on 21 arm's-length sales and that this was a sufficient number of transactions to make the study valid. He felt that the sales-assessment ratio of unimproved agricultural land would

be a good indication of the overall midpoint of the typical sale in relationship to assessed value, i.e., the ratio that is represented in the study (47.74 percent) for unimproved agricultural land is reflective of the entire agricultural unimproved spectrum in Hamilton County for January 1, 1984. He testified that if 100 percent valuation is the goal, agricultural land valuation in Hamilton County should be increased in accordance with the percentages indicated in his study.

William C. Fischer, a real estate appraiser for 22 years, a member of the American Institute of Real Estate Appraisers, and a member of the National Association of Realtors, also testified on behalf of Chief. Fischer supervised a study of open market transaction sales of Hamilton County agricultural land for a period extending from 8 months before to 8 months after January 1, 1984, to compare assessed valuation of such land with the actual sale prices. Every real estate transaction in the Hamilton County clerk's office was examined. Out of the 411 transactions examined, all which could not be considered open market transactions were discarded, and Fischer arrived at 31 arm's-length transactions for the purposes of the study. In regard to these 31 sales, the witness classified each property according to (1) actual consideration; (2) total assessed value; (3) percentage of assessed value to actual value; (4) breakdown of actual land value to assessed land value; and (5) improvements by actual and assessed values. Most of the 31 sales were verified by Fischer by consultation with the realtors or parties involved and by reference to Hamilton County records. Also, he had personally inspected most of the 31 properties.

He, further, did a land classification study to determine what classifications of soil were involved in the 31 sales. This information was obtained from the assessor's records. Fischer defined a sales-assessment ratio as being the assessed value divided by the total actual consideration on the verified sale. He also testified that the size of the parcels (40 to 280 acres) appeared to have no effect on the sale price. He did admit that if a person had to sell agricultural land as a larger tract, he probably would get less than if he sold it in smaller properties.

In his opinion, most of the 31 properties probably were not economic units in and of themselves and that probably one-half of them were sold to next-door neighbors and the other half to someone within a 5- to 10-mile radius. The results of Fischer's compilation were furnished to Gary Hoeltke, another witness, for his use in arriving at a sales-assessment ratio of agricultural lands.

Fischer then testified that he had appraised Chief's property using the three normal approaches: cost, market, and income. In his opinion, Chief's property's value under the cost approach was $1,675,000; under the income approach, was $1,600,000; and under the market data approach, was $1,640,000. He then correlated the three values into a final figure, basing his final figure on which approach he thought was the best approach or a combination of the three approaches. Fischer gave his opinion that the actual value of Chief's property on January 1, 1984, was $1,650,000.

Another expert witness for the plaintiff was Gary Hoeltke, a psychologist and a senior vice president of Selection Research, Inc., of Lincoln, Nebraska. Hoeltke's doctorate from the University of Nebraska-Lincoln is in educational psychology and measurement, with a specialty in statistics and research. Hoeltke examined and reviewed Fischer's study of 31 agricultural sales and found them to be representative of the land in the county, in that they comprised a "miniature Hamilton County" in terms of land classification within the county. Hoeltke then studied the 31 agricultural sales and compared them with the land classification charts of the Nebraska Agricultural Land Valuation Manual used by the assessor to derive an estimate of the sales-assessment ratio for agricultural lands included within that data. Hoeltke concluded that it was his opinion, with 95 to 99 percent confidence, that the average of the agricultural land would fall between 43 and 53 percent in terms of its sales-assessment ratio, with the median being approximately 47 percent. He further testified that six other arm's-length agricultural sales which had been excluded by Fischer also fell in the range of 43 to 53 percent. He pointed out that the study made by Donner was virtually identical to his own conclusions, i.e., 47.74 percent, based on 21

sales.

Hoeltke gave as his opinion that the 1984 sales-assessment ratio of all agricultural land in Hamilton County would be in the range of 43 to 53 percent.

The board then presented testimony of James P. Scott, an associate professor of decision science and chairman of the department of management, marketing, and information systems at Creighton University. Scott testified that he was familiar with the sales-assessment ratios and with the procedure employed by Donner, Fischer, and Hoeltke in gathering the statistical data used in their studies. He felt that data collected by Chief's witnesses were not sufficiently representative to be valid and also pointed out that the parcels sold were smaller than the average farm size in Hamilton County.

Scott suggested that a better procedure would be to take a random sampling of parcels of agricultural lands in the county and then have them appraised by certified appraisers. He felt that sales in the open market are not valid for giving a representative sample of lands which did not sell.

Frank W. Frost testified that he had appraised Chief's property for the board using the cost, market, and income approaches, and by actual inspection of the property. Using the cost approach Frost found the value of Chief's property to be $1,759,675; using the market approach he found it to be $1,675,750; and using the income approach it was found to be $1,677,000. After correlating these results he arrived at his opinion that the actual value of Chief's property was $1,700,000 on January 1, 1984.

Frost further testified he had examined Donner's study and Fischer's summary of 31 agricultural land sales. He criticized these studies on the grounds that the average agricultural land sale was 118 acres, whereas the average farm size in Hamilton County was 416 acres. Frost felt that the sale prices of smaller units of agricultural land might tend to distort rather than to verify the actual value of agricultural land, since such units were not "economic . . . operating" units. He felt that if a farm is assessed as a total operating entity, the sales-assessment ratio should be determined from a study of sales of such operating units. Frost testified that he did not consider sale price to be

synonymous with actual value, and felt that only the income approach should be used to value agricultural land.

Frost did admit that farms have sold for years, all across Nebraska, in smaller units and that the sale of entire farm units is rare. He further agreed the sales-assessment ratio of "non-economic," or smaller, parcels is about 47 or 48 percent in Hamilton County.

The next witness for the board was Bruce Johnson, associate professor of agricultural economics at the University of Nebraska-Lincoln. Johnson stated that the average size of farms in Hamilton County was about 400 acres, including leased ground. He stated that the Nebraska Agricultural Land Valuation Manual is based on earning potential based on soil classification. He felt that a sales-assessment ratio is an imperfect measure when dealing with production property such as agricultural land. Johnson admitted, however, that the agricultural land market may be, in essence, an agricultural parcel market, i.e., where agricultural lands are not sold as whole farm units. Johnson agreed that in the marketplace for agricultural land, parcelization and/or consolidation by existing owners is not only the rule, but almost the absolute rule.

Chief then called Carl D. Novak, an evaluation specialist, as a rebuttal witness. Novak has a doctorate in educational psychology and measurement from the University of Nebraska-Lincoln. He gave his opinion that the data used by Donner, Fischer, and Hoeltke were accurate and probably were the best available. In regard to Scott's opinion that sales are not valid for giving a representative value of lands which did not sell, Novak stated that obviously land not sold cannot have a sales-assessment ratio. Therefore, the only question is whether or not there is reason to believe only undervalued land sold. Novak found "very little" to persuade him that the sample was not representative merely because it was only farmland that was sold. This witness found that Fischer's sample was both adequate and representative, including in geographical distribution, in that the agricultural lands were randomly spread over the entire county.

Novak further felt that the opinion that sales of larger farm

units would produce a higher sales-assessment ratio was not true and that, in fact, in the sample of 31 agricultural sales, the larger parcels have the lower sales-assessment ratios. He further stated that the statistical figure of the size of an average farm is misleading since it is arrived at by dividing the total number of acres by the number of farmers, e.g., if there were 860 farmers and if one farm was 260,000 acres, then the other 859 farms would be 100 acres each.

This witness testified that he independently verified Dr. Hoeltke's findings and found them to be valid.

Neb. Rev. Stat. § 77-201 (Reissue 1986) requires all tangible property and real property to be valued at its actual value for purposes of taxation. " 'Actual value' has been held many times to mean exactly the same as market value or fair market value." *Kearney Convention Center v. Board of Equal.*, 216 Neb. 292, 300, 344 N.W.2d 620, 624 (1984); *Fremont Plaza v. Dodge County Bd. of Equal.*, 225 Neb. 303, 405 N.W.2d 555 (1987). The evidence in this case clearly reflects, in our opinion, that Chief's property was valued at its actual value by the assessor and that the trial court was correct in its finding in this regard.

Neb. Const. art. VIII, § 1, requires that "[t]axes shall be levied by valuation uniformly and proportionately upon all tangible property . . . ."

In an appeal from an action of a county board of equalization, the taxpayer has the burden of proving the contention that the value of the taxpayer's property has not been fairly and proportionately equalized with all other property, resulting in a discriminatory, unjust, and unfair assessment. In such a case, there is a presumption that a board of equalization has faithfully performed its official duties in making an assessment and has acted upon sufficient competent evidence to justify its action, which presumption remains until there is competent evidence to the contrary. Such presumption disappears when there is competent evidence on appeal to the contrary, and from that point on the reasonableness of the valuation becomes one of fact based on the evidence, with the burden of showing the valuation to be unreasonable resting upon the appellant. *Gordman Properties Co. v. Board of*

*Equal.*, 225 Neb. 169, 403 N.W.2d 366 (1987); *Fremont Plaza v. Dodge County Bd. of Equal., supra.*

In this case, the evidence shows that the assessor arrived at her valuation of agricultural lands in Hamilton County solely by using the Nebraska Agricultural Land Valuation Manual, which is based only on earnings potential arrived at by classification of soil. No attempt was made by the assessor to correlate this evaluation with other techniques of assessment. The evidence produced by Chief, based on studies by the state Department of Revenue and by its own experts and involving arm's-length transactions, clearly showed that agricultural land in Hamilton County was systematically undervalued in Hamilton County by 43 to 53 percent of its actual or fair market value. This evidence was sufficient to dispel the presumption that the assessor had properly performed her official duties in making the assessment. Chief's experts established by clear and convincing evidence that the two dissimilar methods used by her in the assessment of the different types of property resulted in the disparity between assessment of urban and agricultural properties in Hamilton County, and further that this disparity caused a discriminatory and unjust assessment of Chief's property.

The evidence offered by the board, while critical of the statistical methods used by Chief's experts and by Donner in his study for the Nebraska Department of Revenue, has failed to satisfactorily refute the evidence of Chief showing that its property was disproportionately assessed in relation to agricultural lands in Hamilton County.

The right of a taxpayer whose property alone is taxed at 100 percent of its true value is to have its assessment reduced to the percentage of that value at which others are taxed. See, *Fremont Plaza v. Dodge County Bd. of Equal., supra; Kearney Convention Center v. Board of Equal., supra.*

Applying that principle to this case, we find that the district court was correct in reducing Chief's assessment by 50 percent. The judgment of the district court is affirmed.

AFFIRMED.