Ev. LUTHERAN GOOD SAMARITAN SOCIETY, DOING BUSINESS AS ST. LUKE'S GOOD SAMARITAN VILLAGE, APPELLEE, V. BUFFALO COUNTY BOARD OF EQUALIZATION ET AL., APPELLANTS.

430 N.W.2d 502

Filed October 14, 1988.   No. 86-976.

John L. Jelkin, of Duncan, Duncan & Jelkin, for appellant Buffalo County Board of Equalization.

Kenneth F. George, of State, Yeagley & George, and Eugene T. Hackler and Robert C. Londerholm, of Hackler, Londerholm, Corder, Martin & Hackler, for appellee.

BOSLAUGH, CAPORALE, and GRANT, JJ., and BUCKLEY, D.J., and COLWELL, D.J., Retired.

COLWELL, D.J., Retired.

Defendants appeal a district court order granting charitable property tax exemption status to plaintiff and its eight apartment buildings near Kearney, Nebraska, pursuant to Neb. Rev. Stat. § 77-202(1)(c) (Supp. 1985).

Plaintiff is a North Dakota corporation having a 63-year history of ministering to the aged in 26 states. Plaintiff's operation in Kearney is known as St. Luke's Good Samaritan Village (Village), which includes a 60-bed intermediate care facility (nursing home), 31 independent living apartments in 8 separate buildings located near the nursing home, a preschool, and 23 acres of farmland. Plaintiff describes the nursing home and the apartments as integrated-care facilities. This appeal relates only to the apartments, since plaintiff's other facilities continue to enjoy tax-exempt status.

Each apartment building is a two-story frame building, formerly an Army barrack, moved to its present location and improved for apartment living. Each building unit has four apartments, two on the first floor and two on the second floor, except one unit has three apartments and an activities area.

There is less demand for second floor apartments since access is by a stairway.

Plaintiff's Kearney facilities are managed by one administrator; generally, they have separate budgets, staff, book accounts, and administrative policies, except in those instances where staff cooperation and overlapping services provide efficient operation.

Prospective apartment tenants make an oral application to rent an apartment with plaintiff's administrator and its staff care team, who decide from the interview whether the applicant is physically and mentally capable of caring for himself or herself in an apartment. Applicants must be 55 years of age or older; however, some tenants have younger persons living with them and sometimes younger Village employees rent and occupy vacant apartments.

The monthly rental charge for the units was established by the administrator after considering comparable local rental charges and projecting future expenses, and then fixing the rental at a near break-even figure. In the event a profit is experienced, those funds are used for capital improvements and operations. At trial time, April 1986, the monthly rentals were lower level units, $220 (except three newly decorated units at $240), and upper level units, $215. Special services available to all tenants were included in the rental charge, including handibus, garden preparation, emergency call light, activity room, snow removal, lawn care, newsletter, weekly nursing calls, and preference for receiving health services at the nearby nursing home. Each renter pays for his or her own electricity for heating, cooling, and general use. Upon acceptance, each tenant must sign a written lease for a term certain, requiring, in addition to usual rental terms, that the tenant will vacate the apartment if the rent is not paid when due or when the tenant is no longer able to physically or mentally care for himself or herself. There have been no evictions for either cause. Sometimes the apartments are advertised in local media and are described as "supportive living environment for people 55 years of age and older." The apartments showed a loss of $2,713.32 in 1984 and a loss of $3,571.42 in 1985, after all expenses and depreciation had been deducted. An expense item for the

current year of $6,966.50 for attorney fees to prepare this exemption appeal was charged to the apartments. A part-time nurse visits the apartments once a week to provide limited health care services such as blood pressure testing and checking medication. Plaintiff is not affiliated with any church or religious denomination, and it does not claim a religious exemption. Of the tenants, only two or three regularly attend nursing home church services and activities. None of the tenants took the available meals at the nursing home costing $2 each.

Dr. James A. Thorsen, chairman of the gerontology program at the University of Nebraska, a program related to the social and psychological aspects of aging, testified on behalf of plaintiff. He gave his opinion that it is beneficial for a person to live in a sheltered environment particularly for frail and elderly people, such as that provided by the Village apartments as integrated with nursing home facilities, in order to be free from fear and anxiety, to have special services available at affordable prices, and to minimize possible transfer trauma in the event of involuntary removal from the apartment complex. There was no evidence that any prospective tenant, absent the availability of the apartment complex, would have had to experience substandard living conditions.

Prior to 1985, plaintiff had enjoyed tax-exempt status for all of its Kearney facilities located on a 35.19-acre tract under its exemption application describing the property as "Religious Non-Profit Long term care Facility." At a hearing on April 9, 1985, the Buffalo County Board of Equalization denied plaintiff's application to continue that exempt status for its eight apartment buildings. Plaintiff appealed that order to the district court, claiming that the apartments qualified for exemption under § 77-202(1)(c). After a full hearing in the district court, the trial judge made findings of fact and law, including: "The Petitioner is a charitable organization and is operated exclusively for the purpose of mental, social or physical benefit of the public." "The nature of the service is similar to the service provided in long term care but not as intensive and it is integrated into the general care center." "[T]he apartment units . . . constitute a reasonable and

necessary extension of the intermediate care facility and that when operated in connection with the care facility are for a charitable purpose as its dominant and primary use." The court order reversed the action of the board of equalization and granted to plaintiff tax-exempt status for the apartments for the tax years of 1985 and 1986.

Defendants assign five errors made by the trial judge in (1) finding that plaintiff had met its burden of proof, (2) failing to apply the "primary test" rule, (3) failing to find that the primary use of the apartments was for housing at cost and not for charitable use, (4) finding that the rental apartment units were exempt because they were operated in connection with a nursing home that was exempt, and (5) creating the "natural expansion" test to determine if the apartment buildings are used for charitable purposes.

Plaintiff describes its national corporate status and purposes as those of a nonprofit corporation generally enjoying federal and state exemptions as a nonprofit entity because of its policy not to deny anyone admission, and, once admitted, its policy not to remove anyone from any home for financial inability to pay. Its motto is "In Christ's Love, Everyone Is Someone." Its primary mission to society is to provide shelter and supportive services to older persons, the handicapped, and others in need. Plaintiff's major support comes from gifts and donations, averaging, in recent years, $2,659,500 annually. Concerning plaintiff's Kearney Village, its primary purpose is to operate integrated, multilevel care facilities to maintain aging, feeble, and infirm elderly persons in a sheltered living environment including the independent living units.

"An appeal from a judgment of the district court concerning action by a county board of equalization is heard as in equity and reviewed de novo." (Syllabus of the court.) *Chief Indus. v. Hamilton Cty. Bd. of Equal.*, 228 Neb. 275, 422 N.W.2d 324 (1988).

The burden of proving the right to an exemption is upon the claimant, *United Way v. Douglas Co. Bd. of Equal.*, 215 Neb. 1, 337 N.W.2d 103 (1983), to prove (1) that the subject property is owned by a charitable, educational, religious, or cemetery organization; (2) that the subject property is not being used for

financial gain or profit to the owner or user; and (3) that the subject property is being used exclusively for charitable, educational, religious, or cemetery purposes, *Immanuel, Inc. v. Board of Equal.*, 222 Neb. 405, 384 N.W.2d 266 (1986).

In 1984, the Legislature amended § 77-202(1)(c) by L.B. 891, which included the definition that a "charitable organization shall mean an organization operated exclusively for the purpose of the mental, social, or physical benefit of the public or an indefinite number of persons." This amendment gives some guidance to the first element in *Immanuel, Inc.*

We are not called upon to decide whether or not plaintiff met its burden to prove element one in *Immanuel, Inc.*, i.e., the eight apartment buildings were owned by a plaintiff qualifying as a charitable organization as defined in § 77-202(1)(c). Further, the evidence shows that the apartments are not operated for financial gain or profit. Rather, this appeal is focused on whether the apartments are used exclusively for charitable purposes.

Concerning the fifth assignment of error, there was some language in the court's order about "natural expansion of the services"; however, the court did not rely on it but, rather, made its findings in terms of "a reasonable and necessary extension of the intermediate care facility . . . ."

The first four claimed errors, being related, are considered together.

> Charity and charitable use are familiar terms in both lay and legal parlance, but they are not capable of exact definition. It may well be said that whether or not an act or a use of property is charitable must in each instance be determined upon its own facts. In the light of this uncertainty of definition and the exclusory exaction of the Constitution and the statute it appears that the determination may depend appropriately upon disclosed incidents of operation. *In short and in particular, does or does not the undisputed evidence disclose a use or uses which are exclusively charitable?*

(Emphasis supplied.) *County of Douglas v. OEA Senior Citizens, Inc.*, 172 Neb. 696, 706-07, 111 N.W.2d 719, 725 (1961).

Charity is defined as being something more than mere almsgiving or the relief of poverty and distress, and it has been given a significance broad enough to include practical enterprises for the good of humanity operated at a moderate cost to those who receive the benefits. A nursing home or home for the aged and infirm operated on a nonprofit basis is exempt from taxation as a charitable institution. The fact that patients who are able to pay are required to do so does not deprive a charitable institution of its eleemosynary character. *Evangelical Lutheran Good Samaritan Soc. v. County of Gage*, 181 Neb. 831, 151 N.W.2d 446 (1967).

The power and right of the state to tax property are presumed, and therefore tax exemption provisions are strictly construed, and their operation will not be extended by construction. The subject property which is claimed to be exempt must clearly come within the provisions granting tax exemption. However, this does not mean that the statutory language should not receive a liberal construction to carry out the express legislative intent. See *Bethphage Com. Servs. v. County Board*, 221 Neb. 886, 381 N.W.2d 166 (1986).

*Immanuel, Inc., supra* at 407, 384 N.W.2d at 268.

It is the use of the property as distinguished from the use of the income from the property that determines whether it is exempt from taxation. "Exclusively" means the primary or dominant use of the property, not an incidental use of the property. *Lincoln Woman's Club v. City of Lincoln*, 178 Neb. 357, 133 N.W.2d 455 (1965).

Property which is owned and used primarily for the purpose of furnishing low-rent housing is not entitled to exemption from taxation as property which is owned and used exclusively for charitable purposes. *County of Douglas v. OEA Senior Citizens, Inc., supra*. See, also, Annot., 37 A.L.R.3d 565 (1971).

"In extending tax exemption to a hospital, only those facilities which are reasonably necessary for the competent operation of the hospital should receive tax-exempt status." *Immanuel, Inc. v. Board of Equal.*, 222 Neb. 405, 409, 384 N.W.2d 266, 269 (1986).

After considering the record, the statutes, including § 77-202(1)(c), and the authorities, we conclude for reasons hereafter stated that plaintiff failed to meet its burden of proof to establish by the evidence that its use of the apartment complex was exclusively for charitable purposes; that plaintiff was not entitled to property tax exemption status for its eight apartment buildings; and that the order of the district court setting aside the order of the board of equalization was error.

The primary use of the apartments was low-cost housing. See *County of Douglas v. OEA Senior Citizens, Inc., supra.* Rentals were fixed at a near break-even cost, including the expense of special services allocated among the tenants. Plaintiff sometimes advertised for tenants. Prospective tenants are first interviewed by staff persons to determine their ability to care for themselves. There was no showing that all persons age 55 years or older having a need would be favorably considered as tenants; to the contrary, all applicants must be (1) physically and mentally capable of caring for themselves and the rented space, and (2) able to climb stairs if the available space was on the second floor. The lease required the tenant to regularly pay the agreed cash rental, subject to eviction if either the rental is not paid when due or he or she is unable to care for himself or herself. Although the location of the apartments near the nursing home, the availability of some nursing home services, some mutual staff personnel, and the modest cost of the apartment accommodations including services were all favorable and beneficial to the tenants, as described by Dr. Thorsen, nevertheless, those benefits in themselves do not change the low-cost-housing character of the apartments.

The order of the district judge is set aside; judgment for the defendants-appellants is entered; and, upon remand, the order of the Buffalo County Board of Equalization, dated April 9, 1985, denying property tax exemption on plaintiff's eight two-story apartment buildings shall be reinstated.

REVERSED AND REMANDED WITH DIRECTIONS.

BUCKLEY, D.J., dissenting.

I cannot agree with the majority opinion that the primary use of the independent living units (apartments) was low-cost housing. Hospitals and nursing homes which have tax-exempt

status house their residents while performing their primary purpose of caring for the sick and elderly. Here, the independent living units are used to care for the elderly who do not require the more institutionalized care of the adjacent nursing home, but who nonetheless are in need of a sheltered environment, and many of whom alternatively would have to be placed in a nursing home. The village moved eight former Army barracks units onto its campus, located them close to its nursing home, and converted them into apartment units, with the combined nursing home and living units designed to be an integrated multilevel facility offering supportive services to all its residents.

The majority opinion describes many of the health care facilities available to the apartment residents and further acknowledges the testimony of gerontologist Dr. James A. Thorsen that the apartment units provide a sheltered environment, that they are integrated with the nursing home facilities, and that in addition to the medical services provided, they help the senior citizen to be free from fear and anxiety.

Dr. Thorsen specifically stated:

> The research in the field of gerontology supports the contention that living in such a setting [i.e., St. Luke's Good Samaritan Village] is of positive benefit in a variety of ways to older people. Especially frail, elderly people. You see the point of such a facility is to try to keep [them] as independent as possible so long as possible and essentially as an alternative to nursing home placement. *Being situated such as it is*, this facility is able to provide a range of services integrated into a continuum of care. And the research would indicate that this does in fact have a positive value in terms of both social well being and in terms of their morale and psychological well being, in terms of being a positive predictor [of] mental health.

(Emphasis supplied.)

He considered the village as an integrated facility for the care of the elderly.

There is ample evidence that many of the residents, though able to care for themselves in a physical sense, would not be able to function independently but for the support and proximity of

the nursing center nearby.

The majority opinion describes the services to the residents as "favorable and beneficial," but concludes that they do not change the primary use of the units as providing low-cost apartments. I am compelled to the opposite conclusion. The units are a part of the multilevel integrated facility of the Village. I agree with the trial court's finding that the units were operated in connection with the care facility and were a "logical extension" of the purpose of the care facility.

The trial court's decision was correct, and I would affirm.