AFFILIATED FOODS COOPERATIVE, INC., APPELLANT, V. COUNTY OF MADISON ET AL., APPELLEES.

428 N.W.2d 201

Filed August 26, 1988.   No. 86-650.

David A. Domina, of Domina, Gerrard & Copple, P.C., for appellant.

Warren L. Reimer, Deputy Madison County Attorney, for appellees.

HASTINGS, C.J., SHANAHAN, and FAHRNBRUCH, JJ., and RILEY and OTTE, D. JJ.

FAHRNBRUCH, J.

Affiliated Foods Cooperative, Inc. (Affiliated), appeals as excessive for 1985 tax purposes the $5,298,851 value placed on its real estate and warehouse facilities by the Madison County assessor.

Both the Madison County Board of Equalization and the district court accepted the assessor's value and refused to lower that value to $3,300,000, as prayed by Affiliated. We affirm.

In appealing the district court judgment, Affiliated assigns five errors, which may be consolidated into two: (1) The trial court erred in refusing to make a proper downward adjustment in the actual value of appellant's real estate for purposes of ad valorem taxes for 1985, and (2) the trial court erred in refusing to strike the testimony of Ransom G. Roman, an appraiser hired by the Madison County assessor.

In an appeal to the district court, the judge hears the case as in equity and determines anew all questions raised before the county board of equalization which relate to the liability of the property to assessment, or to the amount thereof. Neb. Rev. Stat. § 77-1511 (Reissue 1986).

An appeal from the judgment of the district court concerning action by a county board of equalization is heard as in equity and reviewed de novo. *Fremont Plaza v. Dodge County Bd. of Equal.*, 225 Neb. 303, 405 N.W.2d 555 (1987); *Spencer Holiday House v. County Bd. of Equal.*, 220 Neb. 607, 371 N.W.2d 286 (1985). A county board of equalization is afforded the presumption that it has faithfully performed its official duties. On appeal, this presumption disappears when there is competent evidence to the contrary. From that point on, the question of unreasonableness of valuation fixed by the board of equalization becomes one of fact based upon the evidence, unaided by the presumption. The burden of showing such value to be unreasonable rests upon the applicant on appeal from the action of the board. *Richman Gordman v.*

*Board of Equalization*, 215 Neb. 379, 338 N.W.2d 761 (1983); *Spencer Holiday House, supra.*

The transcript of the hearing before the county board of equalization does not list the county's witnesses nor give a summary of the county's evidence. In the district court appeal, the county assessor testified she only recommended her final valuation figure to the board. There is no indication in the record that the assessor gave the board any supporting data for her recommendation. Therefore, in our de novo review of the record in this case, we shall examine the facts to determine whether the valuation fixed by the Madison County Board of Equalization and the district court was unreasonable.

While the Supreme Court reviews equity cases de novo and reaches an independent conclusion without being influenced by the findings of the trial court, where credible evidence is in conflict, we may give weight to the fact the trial court saw the witnesses and observed their demeanor while testifying. *In re Plummer Freeholder Petition, ante* p. 520, 428 N.W.2d 163 (1988); *III Lounge, Inc. v. Gaines,* 227 Neb. 585, 419 N.W.2d 143 (1988). Also, in an appeal of an equity case, we give proper consideration to the fact that the trial court inspected the property. *Lincoln East Bancshares v. Rierden,* 225 Neb. 440, 406 N.W.2d 337 (1987); *Newson Constr. Co. v. Calvary Assembly of God Church,* 193 Neb. 556, 227 N.W.2d 886 (1975). In the case at bar, the trial judge inspected the property by agreement of the parties.

The Madison County assessor hired Ransom Roman, a local licensed real estate appraiser, to appraise commercial properties within the county upon which improvements were added or removed since the property's last valuation. Roman began working in that capacity on a part-time basis in May 1984. He spent about 20 percent of his time appraising commercial property for tax purposes and 80 percent of his time on private fee appraisals. Roman became a licensed real estate appraiser when the Nebraska licensure act became effective in 1974. From 1974 to 1982, he not only appraised, but also sold, real estate in northeast Nebraska. From 1982 to time of trial, Roman confined his activities to appraisals.

In carrying out his assignment, Roman determined that

Affiliated constructed a 49,060-square-foot addition to its main building in 1984. The addition was 90 percent completed as of January 1, 1985. From blueprints, Roman calculated that the main building, in January 1985, covered 430,312 square feet. During the course of his appraisal, Roman visited the building twice, obtained floor plans and blueprints, discussed the latest addition with Affiliated's full-time architect, and reviewed prior appraisals in the Madison County assessor's office. As required by the Nebraska Department of Revenue, Roman utilized the Marshall Valuation Service as a guideline to determine replacement cost.

Roman testified that Affiliated's warehouse fit within the Marshall service's class S designation regarding replacement cost per square foot. However, he used the service's class D replacement costs, which are lower than those in class S. Roman did this because, in his experience, the class D costs were more comparable to actual local construction costs than were class S costs. On the warehouse portion of the building, the class S cost per square foot ranged from $21.96 to a low of $11.07. The cost of class D construction ranged from a low of $9.59 to a high of $21.28 per square foot. Use of the class D costs was not detrimental to Affiliated.

Roman calculated the replacement cost of Affiliated's buildings to be: office building, $509,640; refrigeration warehouse section, $2,505,886; and storage warehouse, $3,103,345; a total of $6,118,871. The total figure included a 1984 addition, which Roman found cost $1,156,187. He reduced the addition cost to $1,040,568 because the addition was only 90 percent complete as of January 1, 1985. In further valuing the property, Roman reduced the value of 129,870 square feet of the warehouse by $6.39 per square foot, for a total of $829,869 for functional depreciation. The functional depreciation was due primarily to a portion of the roof's being supported by racks. The racks are steel uprights, with steel crossmembers, that form a vertical truss. Crossmembers on which pallets are placed tie all the uprights together. Apparently, that type of roof support is not ideal.

After deducting the functional depreciation, Roman arrived at a value of $5,289,002 before deducting physical depreciation.

This figure was exactly $1,040,568 (90 percent of the appraisal cost of the addition) higher than the assessor's appraisal for 1984. From the $5,289,002 figure, Roman deducted 7 percent, or $370,230, for physical depreciation. This depreciation was $72,840 more than was deducted in the assessor's appraisal for 1984. This then reduced the $5,289,002 value to $4,918,772.

Roman added to the $4,918,772 value of the main buildings $17,922 for railroad trackage, $2,195 for fencing, $26,190 for tanks, $2,421 for pumps, $15,356 for an old, small warehouse, and $109,194 for a truck shop. Thus, Affiliated's improvements to land totaled $5,092,050. That actual value figure was increased to $5,298,851 by adding land value of $206,801.

Roman recognized that there are three approaches to determining actual or market value of property: income, market, and cost. He considered all three approaches, but ultimately used only the replacement cost approach. Roman discarded both the income and market approaches because of insufficient facts upon which to formulate an opinion. The cost approach had previously been used by the county assessor to appraise Affiliated's property.

The Madison County assessor adopted Roman's $5,298,851 appraised actual value of Affiliated's land and improvements for the tax year 1985. The Madison County Board of Equalization fixed the value of Affiliated's land and improvements at $5,298,851. After a de novo trial and inspection of the property, the district court also fixed the value of Affiliated's land and improvements at $5,298,851 for the 1985 tax year.

At trial in the district court, Affiliated called Patrick E. Morrissey of Omaha as its expert witness on values for the 1985 tax year. He was hired to appraise Affiliated's real estate for tax litigation in 1983 and again for the 1985 tax year. A full-time self-employed appraiser, Morrissey received his Nebraska real estate appraiser's license in 1978. At time of trial, he was one of 20 to 30 of the Nebraska active and nonactive members of the Appraisal Institute (MAI appraisers). Morrissey's experience included appraising real estate for financial and governmental institutions, private clients, attorneys, and syndicators.

Morrissey agreed with Roman that there were insufficient facts available to appraise Affiliated's property by an income approach. He, therefore, used the cost and market approaches.

Using the Marshall Valuation Service for class S warehouses, Morrissey calculated the replacement cost of the improvements to be $7,303,000, compared to Roman's calculated replacement cost of $6,118,871.

Roman, from his replacement cost, deducted $370,230 for physical depreciation and $829,869 for functional depreciation, for a combined depreciation of approximately 20 percent of replacement cost. Morrissey deducted 50 percent, or $3,651,500, for physical depreciation and functional obsolescence. The 50-percent figure was garnered through market extraction, using the same property Morrissey used when doing his market approach. Next, Morrissey deducted 30 percent of the $3,651,500 for locational obsolescence due to the building's Norfolk location, leaving an improvement value of $2,556,050. Morrissey's 50 percent and thereafter 30 percent reductions constitute depreciation and obsolescence deductions of 65 percent. To the resulting improvement value, Morrissey added $100,000 for the truck shop, making an improvement total value of $2,656,050. This compared to Roman's improvement value of $5,092,050. Morrissey added $220,000 land value to his $2,656,050 improvement value, making a total actual 1985 tax value of $2,876,050. Roman added his land value of $206,801 to his improvement value, thereby calculating the 1985 actual tax value of land and improvements to be $5,298,851.

Morrissey testified there was no market for the Affiliated property. In appraising the property, Morrissey also utilized what he termed the "Direct Sales Approach." Roman referred to it as the "market approach." Appraisers using this approach compare recently sold similar properties to the subject property. Adjustments are made for differences between the subject property and the "similar properties."

Morrissey discovered sales of two grocery distribution warehouses in Omaha and one in Gering, Nebraska. The United A. G. warehouse in Omaha sold in December of 1984 for $3,200,000. It was 360,717 square feet in size. After

deducting $563,600 for land value from the total sales price, Morrissey calculated the selling price per square foot to be $7.30.

The second Omaha property, a Hinky Dinky warehouse, sold in November of 1982 for $5 million. It was not a cash sale. The expert testified this warehouse was 321,793 square feet, with land value of approximately $1 million. Morrissey calculated its selling price per square foot to be $12.43. The warehouse in Gering sold for $856,500 in April of 1985, after the assessor had fixed the value of Affiliated's property. The size of the warehouse was 144,530 square feet; the land was valued at $78,872. Morrissey calculated the selling price per square foot to be $5.38.

Morrissey also considered the sales of eight Omaha warehouses ranging in size from 20,000 to 48,000 square feet. The record gives no indication of these properties' selling prices or their length of time on the market. At the time Morrissey's appraisal was conducted, four warehouses were for sale in Norfolk, ranging in size from 20,000 to 72,000 square feet. Their size alone does not make them comparable. These properties had been on the market from 1 to 3½ years. It was Morrissey's opinion that this data indicated a need to adjust the Omaha sales prices for the Norfolk location.

Morrissey deducted 30 percent from the price per square foot of the Omaha warehouses because of their location. His reasons for arriving at that figure are not persuasive. After adjusting the prices, Morrissey had a range of $5.11 to $8.70 per square foot. He decided $6.50 per square foot was right for Affiliated's property. Again, the record is not persuasive why $6.50 was the appropriate figure. Morrissey indicated that the three "comparable" properties were near or adjacent to an interstate. The Gering property is 50 miles from Interstate 80; Affiliated's warehouse is within 70 to 100 miles of three different interstate highways.

Using $6.50 per square foot and 431,000 square feet, Morrissey calculated the value of Affiliated's warehouse to be $2,801,500, after the 50- and 30-percent deductions. He added to that figure $100,000 for the truck shop and $220,000 as the land value, for a total of $3,121,500 actual value.

After comparing the figures from the cost and market, or direct sales, appraisal approaches, Morrissey decided Affiliated's warehouse should be valued at $3 million. Affiliated's prayer was for a $3,300,000 value. In his appraisal, Morrissey acknowledged that his final appraised value had not changed since 1983, even though over 100,000 square feet had been added to the warehouse. It was Morrissey's opinion that the additional square footage added no value to the warehouse.

The record is not persuasive that the Omaha and Gering properties were sufficiently comparable to provide probative force to a direct sales or market approach to value. The Omaha properties were from 70,000 to 100,000 square feet smaller in size and the Gering property only about one-third the size of Affiliated's main building. In regard to the sale of one of the Omaha properties, approximately $1,400,000 to $1,500,000 in federal taxes were avoided. Morrissey, while acknowledging that fact, gave no consideration to that data, although the seller did. Morrissey did not consider the percentage of refrigerated or cooler warehouse space of the comparables to that of Affiliated's.

Affiliated argues that the factors set forth in Neb. Rev. Stat. § 77-112 (Reissue 1981) were not considered by the county "in any meaningful way." Brief for appellant at 19.

As Affiliated admits in its brief, nothing in the statute requires the county assessor or county board of equalization to use all of the factors set forth therein. Instead, those officials may use such factors or combination thereof which they determine to be applicable in determining actual value under the state Constitution. *Airport Inn v. County Bd. of Equalization*, 215 Neb. 659, 340 N.W.2d 378 (1983); *Spencer Holiday House v. County Bd. of Equal.*, 220 Neb. 607, 371 N.W.2d 286 (1985).

Roman testified that he found no properties suitable for comparison with Affiliated's warehouse. He, therefore, could not use the market approach to value. Morrissey found two properties which it is claimed Roman could have used. However, Morrissey deducted 30 percent from their sales prices to make them comparable. It is clearly a matter of opinion whether those two properties were, in fact, sufficiently

comparable to Affiliated's warehouse to make a suitable comparison. We find that the market, or direct sales, approach as used is not convincing in this case.

The remainder of appellant's argument is based upon the premise that the county has adduced "no credible evidence that withstands scrutiny," while it has presented "Morrissey's testimony, which clearly constitutes 'competent evidence.' " Brief for appellant at 26-27. Unfortunately for the taxpayer, that characterization is not borne out by the record.

Morrissey began his cost approach appraisal with a valuation of $7,303,000. Roman began with a value of $6,118,871. Roman's figure includes 90 percent of the value of the partially completed addition. Morrissey ignored this addition. The primary difference in the appraisers' final figures is the amount of depreciation and obsolescence deducted by each.

Morrissey deducted 50 percent from his $7,303,000 figure for physical and functional obsolescence. Nearly two-thirds of Affiliated's warehouse was less than 10 years old at the time Morrissey did his appraisal. Nearly one-quarter of the structure was less than 2 years old. To say these newer portions of the structure have physically or functionally depreciated by 50 percent is unreasonable. Further, Morrissey deducted 30 percent from the depreciated figure for locational obsolescence, making a total of 65 percent deducted for depreciation and obsolescence. This, coupled with his failure to include an increased value of the latest addition, casts doubt on the validity of Morrissey's appraisal. He gave no increase in value for two additions added since his 1983 appraisal. Affiliated's second assignment of error has no merit.

In its pleadings before the county board of equalization and in the district court, Affiliated contended that the tax valuation for 1984 was binding upon the board for 1985 because it was fixed by the Madison County District Court in earlier litigation. The 1984 valuation was lower than the assessor's 1984 appraisal. Neb. Rev. Stat. § 77-1502 (Cum. Supp. 1984) provides that the county board of equalization shall meet commencing April 1 of each year for not less than 3 nor more than 60 days to review and decide protests filed with it. Under the same section, the board may meet at any time for the

purpose of equalizing assessments of any omitted or undervalued property. It thus appears that the Legislature provided that the valuation for property for assessment purposes for each year could be different, according to the circumstances. In deciding *DeVore v. Board of Equalization*, 144 Neb. 351, 13 N.W.2d 451 (1944), we held in effect that a decree fixing the value of property under a prior assessment is not admissible to prove the value of real estate under a subsequent assessment. See, also, *Omaha Paxton Hotel Co. v. Board of Equalization*, 167 Neb. 231, 92 N.W.2d 537 (1958). Affiliated's contention of res judicata has no merit.

Upon de novo review, we find, as did the Madison County Board of Equalization and the district court, the actual value of Affiliated's land and improvements for the 1985 tax year to be $5,298,851.

Affiliated has not met its burden of showing such value to be unreasonable. The district court's judgment is affirmed.

AFFIRMED.