FIRST NATIONAL BANK & TRUST OF SYRACUSE, NEBRASKA, APPELLANT, V. OTOE COUNTY, NEBRASKA, ET AL., APPELLEES.

445 N.W.2d 880

Filed September 22, 1989.    No. 87-949.

Otto H. Wellensiek for appellant.

John F. Steinheider, of Hoch & Steinheider, for appellee Otoe County.

BOSLAUGH, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

SHANAHAN, J.

First National Bank & Trust of Syracuse, Nebraska (Bank), appeals from the district court's judgment affirming the Otoe County Board of Equalization's decision concerning the actual value of the Bank's real estate for 1986 taxation. The Bank claims that the court erred in upholding the board's valuation and excluding certain evidence.

## THE NEW BANK

In September 1984, the Bank completed construction of its new banking facility in Syracuse at a cost of $1,610,873, which included land acquisition, $202,500; demolition, $23,579; general contractor, $866,550; mechanical contractor, $171,974; electrical contractor, $79,550; architectural fees, $179,550; bank fixtures, $59,970; and carpet, $27,200.

The Bank's main building has two floors above ground, with 6,588 square feet on each floor, and a basement with 6,140 square feet. The building structurally consists of a steel frame with block backup walls, brick facing, and numerous windows, and has a steel bar joist and steel deck roof with insulation and a 7.5- by 52-foot skylight. The building's interior has quarry tile floor and carpeting, wallpapered walls, a suspended acoustical tile ceiling, glass partitioned walls, an open atrium, and lighting, both recessed and spot. Offices and teller windows occupy the first and second floors. The basement contains storage areas and a large meeting room. The building is heated and cooled by a heat pump system, and has good plumbing, lighting, and electrical facilities.

Behind the Bank's main building is a separate 560-square-foot facility with a drive-up window and a remote pneumatic teller box. The facility includes a 473-square-foot canopy, and a walk-in foyer with an automatic teller machine and a walkup teller window.

The bank property also includes a heated, two-stall 576-square-foot garage, a one-stall 312-square-foot garage, and 14,468 square feet of paved parking.

## APPRAISALS AND ASSESSMENT

In 1985, Otoe County hired John Charles Fritz, a licensed Nebraska real estate appraiser, to reappraise all real property in the county as of January 1, 1986. Fritz appraised the bank property at $839,790. The assessor and the equalization board reviewed Fritz' appraisal, compared Fritz' appraisal of the bank property with appraisals of similar properties, and adopted the appraisal as the county's assessment of actual value for the Bank's property.

Robert M. Ogden, a licensed Nebraska real estate appraiser hired by the Bank to determine the value of the Bank's property as of January 1, 1986, noted three accepted methods of determining the actual value of real property: the cost approach, the market approach, and the income approach.

Under the cost approach, Ogden determined the replacement cost of improvements, subtracted depreciation of the improvements, and added the value of the land. Ogden identified three types of depreciation: physical, functional, and economic depreciation. Physical depreciation results from deterioration of the improvements over time. Functional depreciation or obsolescence results from lack of market acceptance due to the obsolete nature of improvements, inability to recover the cost of unique features of a building suited to one business but unusable if the building is sold to another type of business, and decreased value caused by an improvement that is "overbuilt" in relation to the locale or community where the structure is situated. Economic depreciation results from external economic forces which depress the value of the property.

Using the Marshall Valuation Service and Residential Cost Handbook (Marshall-Swift manual) published by Marshall and Swift Publication Company, Ogden estimated the replacement cost of structures on the bank property at $1,200,000. Ogden found no physical depreciation had occurred during the 16 months between completion of the structures in September 1984 and the valuation date, January 1, 1986. However, Ogden estimated functional obsolescence to be 40 percent and stated:

> The layout of the subject property is functionally below typical due to the specialized nature of the building as a

main bank facility. The construction of the subject property exceeds the typical steel building used for a small-town office building and is overadequate due to the bank utilizing the facility as a monument-type structure.

Ogden also relied on market research in arriving at 40 percent as the functional depreciation for the bank property:

> That figure was based on research of the market of financial institutions that was [sic] sold, and I found one particular property that I abstracted out a functional depreciation from that sale that showed a 52 percent functional depreciation. And I estimated the subject was a similar financial institution and estimated it to be 40 percent.

Ogden estimated economic depreciation at 30 percent. Economic data provided by Ogden showed retail sales in Syracuse had declined by 19 percent over the 6-year period from 1980 through 1985, and unemployment in Otoe County had increased from 5.5 percent in December 1984 to 6.7 percent in December 1985. No evidence in the record showed a relationship between retail sales or unemployment and prices in real estate sales or the decline of real estate prices in Syracuse.

Using sales of unimproved property, Ogden estimated the value of the bank site at $47,000 and, using the Marshall-Swift manual, found the value of the Bank's parking lot was $14,500. Ogden determined the value of the bank property under the cost approach was $422,000.

Under the market approach, Ogden examined 12 sales of commercial property in Nebraska and attempted to extrapolate a sale price for the bank property. Ogden's "comparable" sales ranged from the sale of an old grocery store in Syracuse, an 8,096-square-foot building which sold for $6.64 per square foot, to the sale of a bank in Lincoln, a 4,830-square-foot building which sold for $89.03 per square foot. Although several of the sales involved structures designed to house financial institutions, only 1 of the 12 properties Ogden studied was larger than the Syracuse bank facilities. In his market analysis, Ogden relied heavily on the sale of a 29,288-square-foot bank in Grand Island which sold for $28.57 per square foot, and admitted that the other properties used for

comparison would need substantial upward or downward adjustments in the sales price to compare with a hypothetical sale price for the Bank in Syracuse.

Ogden believed that the sale price of the Bank's main building would be $29 per square foot, which was multiplied by the amount of the Bank's office space above ground in the main building and produced a value of $390,000 for the Bank's property. Ogden did not consider the basement or separate structures in determining the value of the bank property under the market approach.

Ogden rejected the income approach as an accurate indicator of the bank property's value because financial institutions usually own their own building, resulting in few if any comparable rentals from which to extrapolate an income figure for capitalization.

Considering all three methods of valuation, Ogden gave most weight to the market approach for his opinion that the actual value of the Bank's property was $390,000 as of January 1, 1986.

Glen Davidson, a licensed Nebraska real estate appraiser and witness for the Bank, testified that based on his knowledge of sales in and around Syracuse over a 25-year period, the market value of the Bank's property was between $200,000 and $250,000.

Fritz testified for the county. In valuing the Bank's property, Fritz rejected the market and income approaches, since there was insufficient data from which to extrapolate a sale price or rent for the property. Thus, Fritz relied on the cost approach and determined the reproduction cost of the Bank's improvements by using a 1981 Marshall-Swift manual formerly prescribed by the Nebraska Department of Revenue. From the reproduction cost, Fritz subtracted depreciation and then added the value of the Bank's land.

The Marshall-Swift manual provides different square foot costs for reproduction, which are based on the quality of construction: excellent, good, average, and low cost. In the manual, the terms *average* and *good* refer to the quality of construction. The cost of reproduction for average construction is 24 percent less than the cost for good

construction. Although the Bank's improvements were classified as good rather than average according to the 1981 manual, Fritz used average construction cost for the Bank's improvements, since the Bank was located in a small town and had overbuilt its facilities. Regarding his use of "average" reproductive construction costs in arriving at a value for the Bank's property, Fritz stated:

> [I]t's the judgment of the appraiser which direction he cares to go when it's a fine line. And in this case, and the reason we went to the lower value is because of the opinion of Number 2, relative location and 3 desirability of functional use and the market value.

However, Fritz used prices for good construction in determining the value of similarly constructed financial institutions in Nebraska City, a larger community in Otoe County.

To determine depreciation, including physical, functional, and economic depreciation, Fritz studied sales prices of 45 to 50 commercial properties in Otoe County from 1981 to 1984, compared reconstruction costs for improvements on those properties, and, using this data, determined the depreciation rate applicable to commercial property of various ages throughout the county. Fritz applied a 5-percent depreciation rate to improvements on the Bank's property and concluded that the Bank's property had an actual value of $917,560 as of January 1, 1986.

The county granted a 10-percent "roll back" to all improvements in the county, resulting in an assessed value of $825,805 for the Bank's improvements. According to Fritz, the Bank's land had a value of $13,985. Therefore, the total assessed actual value for the Bank's property was $839,790 as of January 1, 1986.

Fritz testified that he valued all properties in the county through a uniform process and that the value of the bank property in Syracuse was equalized with the value of other property in Otoe County.

During cross-examination of Fritz, the Bank offered a copy of the 1984 Marshall-Swift manual to show that Fritz misused the manual's classifications of "good" and "average"

construction as factors affecting the value of the Bank's property. Nothing shows that the 1981 manual, used by Fritz, and the 1984 manual are substantially similar. Pursuant to the county's objection, the court excluded the 1984 manual because the document was "not the manual in force at the time" Fritz conducted his appraisal. However, on cross-examination Fritz acknowledged that his use of "good" and "average" construction for reproduction costs was based on location of the improvements, while the 1984 Marshall-Swift manual used a classification based on the quality of construction, not the site of the structure.

## STANDARD OF REVIEW

"An appeal from action by a county board of equalization is an equity action tried de novo in the district court." *Gordman Properties Co. v. Board of Equal.*, 225 Neb. 169, 177, 403 N.W.2d 366, 372 (1987). "On appeal to the Supreme Court, an equity case involving action by a county board of equalization is a trial of factual questions de novo on the record, requiring the Supreme Court to reach a conclusion independent of the findings of the trial court." *Id*. However, when credible evidence conflicts, the Supreme Court may give weight to the fact that the trial judge observed the witnesses and accepted one version of the facts over another. *Greenwood Ranch v. Morrill Cty. Bd. of Equal.*, 232 Neb. 114, 439 N.W.2d 760 (1989); *Affiliated Foods Co-op v. County of Madison*, 229 Neb. 605, 428 N.W.2d 201 (1988). See *Equitable Life v. Lincoln Cty. Bd. of Equal.*, 229 Neb. 60, 425 N.W.2d 320 (1988).

In a taxpayer's appeal from action of a county board of equalization, the taxpayer has the burden to prove by clear and convincing evidence that the action of the county board of equalization, in fixing or determining the value of real estate, is unauthorized by or contrary to constitutional or statutory provisions governing taxation. *Gordman Properties Co. v. Board of Equal., supra; Greenwood Ranch v. Morrill Cty. Bd. of Equal., supra; Fremont Plaza v. Dodge County Bd. of Equal.*, 225 Neb. 303, 405 N.W.2d 555 (1987); *Airport Inn v. County Bd. of Equalization*, 215 Neb. 659, 340 N.W.2d 378 (1983); *Richman Gordman v. Board of Equalization*, 215 Neb.

379, 338 N.W.2d 761 (1983). See, *Spencer Holiday House v. County Bd. of Equal.*, 215 Neb. 194, 337 N.W.2d 759 (1983); Neb. Rev. Stat. § 77-1511 (Reissue 1986).

When a county board of equalization has determined the value of property, uniformly and impartially assessed through a formula in substantial compliance with statutes governing taxation, for reversal of the board's action a taxpayer must show more than a difference of opinion concerning the assessed value of the taxpayer's real estate. *Greenwood Ranch v. Morrill Cty. Bd. of Equal., supra.*

## ACTUAL VALUE

Regarding assessment of property for taxation, Neb. Rev. Stat. § 77-201 (Reissue 1986) provides in part: "[R]eal property in this state, not expressly exempt therefrom, shall be subject to taxation and shall be valued at its actual value. Such actual value shall be taken and considered as the taxable value on which the levy shall be made." Neb. Rev. Stat. § 77-112 (Reissue 1986) provides in part:

> [A]ctual value of property for taxation shall mean and include the value of property for taxation that is ascertained by using the following formula where applicable: (a) Earning capacity of the property; (b) relative location; (c) desirability and functional use; (d) reproduction cost less depreciation; (e) comparison with other properties of known or recognized value; (f) market value in the ordinary course of trade; and (g) existing zoning of the property.

Section 77-112, which specifies factors for determining actual value of real estate for tax purposes, does not require use of all the specified factors, but requires use of applicable statutory factors, individually or in combination, to determine the actual value of real estate for tax purposes. *Affiliated Foods Co-op v. County of Madison, supra*; *Spencer Holiday House v. County Bd. of Equal.*, 220 Neb. 607, 371 N.W.2d 286 (1985).

"In tax valuation cases actual value is largely a matter of opinion and without a precise yardstick for determination with complete accuracy." *Id.* at 611, 371 N.W.2d at 288. See, also, *Richards v. Board of Equalization*, 178 Neb. 537, 134 N.W.2d

56 (1965).

We find the Bank has not shown that the equalization board improperly determined actual value for the Bank's property.

Ogden, who testified for the Bank, relied on two methods to determine the value of the Bank's property. In reference to the market approach, Ogden admitted that all but one of his "comparable" sales would require substantial adjustment to provide an accurate index for the value of the bank property in Syracuse. We believe that Ogden relied on insufficient or incomplete data in his determining the value of the Bank's property under the market approach. For that reason, Ogden's opinion on value under the market approach has little weight, if any.

Applying the cost approach, Ogden valued the Bank's land at $47,000 and used $1,200,000 for the reproduction cost of the Bank's improvements. However, Ogden used 70 percent depreciation for the Bank's improvements, which were 16 months old on January 1, 1986, in determining value under the cost method, namely, $422,000.

We accept Ogden's premises: A structure in a small community is worth less than the same structure would be in a larger community; a bank building will not retain the value of its unique features if the building is sold for use in another type of business; and economic conditions can depress the value of real estate. However, we find nothing in the record to support Ogden's applied depreciation rates of 40 percent for functional obsolescence and 30 percent for economic depreciation.

Davidson's appraisal is also unpersuasive. Although Davidson claimed that his appraisal was based on comparable (similar) sales, there is no evidence that Davidson relied on sales of property similar to the bank property.

Regarding Fritz' opinion on value, Fritz used average construction rather than good construction concerning reproduction costs in view of the Bank's location and functional obsolescence, which, according to Fritz, decreased valuation of the Bank's property by 24 percent. However, Fritz testified that the 24-percent decrease was accurate and was corroborated by valuations for improvements of similar financial institutions in Nebraska City, improvements for which values had been

determined by using the classifications of "good" and "average" construction based on the quality of construction, as reflected in the 1981 Marshall-Swift manual.

For a depreciation rate, Fritz considered the difference and relationship between construction costs and sales prices for commercial property in Otoe County and arrived at a depreciation rate of 5 percent. Fritz used this same method to determine depreciation rates for commercial property throughout Otoe County. We find that Fritz' appraisal and his opinion on value, which was adopted by the county board of equalization, is a credible expression of value for the Bank's property. Further, the district court, having heard the witnesses, chose to believe the county's witnesses and not believe the Bank's witnesses. In view of the record, we conclude that the Otoe County Board of Equalization acted properly in determining the actual value of the Bank's property.

## EXCLUSION OF EXHIBIT

The Bank argues that "documents on which an expert witness relies or on which he bases his opinion should be admitted into evidence," and, therefore, the court erred in excluding the 1984 Marshall-Swift manual, which was offered to impeach Fritz' testimony by showing he misused the 1981 manual.

Nothing indicates that the 1984 manual was substantially similar to the 1981 manual used by Fritz. Without similarity to the 1981 manual, the 1984 manual supplied no basis for impeachment of Fritz. See Neb. Evid. R. 401 (Neb. Rev. Stat. § 27-401 (Reissue 1985)) (relevant evidence). Moreover, on cross-examination of Fritz, the Bank elicited that the manual used by Fritz did not state or recognize locality as a basis for classifying a structure as "good" or "average" construction in reference to the cost of reproduction. Whatever impeachment may have been achieved through introduction of the 1984 manual as an exhibit was accomplished by Fritz himself, when he acknowledged his misuse of the qualitative classifications of construction in reference to reproduction costs. Under the circumstances, there is no reversible error in the district court's exclusion of the 1984 Marshall-Swift manual. See Neb. Evid.

R. 103(1) (Neb. Rev. Stat. § 27-103(1) (Reissue 1985)) (no reversible error unless evidential ruling adversely affects a litigant's substantial right).

## CONCLUSION

After a de novo review, we find that the Otoe County Board of Equalization properly determined actual value of the Bank's property. Therefore, we affirm the district court's judgment, which affirmed the decision of the Otoe County Board of Equalization.

AFFIRMED.

HASTINGS, C.J., participating on briefs.

BOSLAUGH, J., dissenting.

The sole issue in this case is the fair market value of the appellant bank's property. Neb. Rev. Stat. § 77-201 (Reissue 1986) requires that real estate be valued at its actual value. For the purposes of taxation, the terms "actual value," "market value," and "fair market value" mean exactly the same thing. *Xerox Corp. v. Karnes*, 217 Neb. 728, 350 N.W.2d 566 (1984).

A taxpayer may question the assessed value (actual value) of its real estate, the lack of proportionate and uniform valuation of the property, or both issues, in a proceeding before a board of equalization. *Chief Indus. v. Hamilton Cty. Bd. of Equal.*, 228 Neb. 275, 422 N.W.2d 324 (1988). In this case, the appellant questioned only the assessed value of its property. The evidence of the appellees, however, related primarily to the matter of equalization, which is not an issue in this case.

There is no substantial dispute concerning the value of the land itself. The primary controversy is over the valuation of the improvements, namely, the bank building.

The record shows that the county assessor had never been in the building, did not personally inspect or measure the property, and relied entirely upon the determination that had been made by the appraisal company. Where the assessor does not act upon his own information, or does not make a personal inspection of the property, there is no presumption that the official assessment is valid. *Grainger Brothers Co. v. Board of Equalization*, 180 Neb. 571, 144 N.W.2d 161 (1966).

On cross-examination, the assessor testified as follows:

Q- I'll rephrase my question. We'll assume we have an identical building in Syracuse and Nebraska City. Both cost $600,000.00. The one in Nebraska City will sell for $500,000.00 and the one in Syracuse will sell for $200,000.00. How would you assess those two buildings for tax purposes?

A- I would say they would be assessed at $600,000.00, both areas.

Q- In both places?

A- In both places.

Q- And is that the theory you used in the taxation of the bank building in 1985 — '86 rather?

A- That is correct.

The witness John Fritz, who testified for the county and whose company performed the reappraisal for Otoe County, testified that the value of the bank property was determined by use of a cost of reconstruction less depreciation method. The critical factor in that method is the determination of the proper amount of depreciation to be allowed so that the result will be the fair market value of the property. Depreciation in this process includes not only physical deterioration, but also functional and economic obsolescence. If an inadequate depreciation allowance is made, the resulting figure will be far in excess of the fair market value of the property. Fritz allowed only 5 percent depreciation.

In this case, it seems to be generally conceded that the property was "overimproved" in the sense that it is doubtful that any commercial building in Syracuse, Nebraska, a community of approximately 1,600 persons, could ever be sold to a willing buyer in an arm's-length transaction for an amount approaching $1 million. In an effort to arrive at some further reduction in the value of the building, it appears that Fritz used "average" construction costs rather than "good," despite the fact that there seems to be no justification for using average rather than good for a modern, newly constructed building.

In *First Fed S & L Ass'n v Flint*, 415 Mich. 702, 329 N.W.2d 755 (1982), the Supreme Court of Michigan discussed the difficulty inherent in attempting to determine market value by cost of reproduction. In that case the court said:

The constitution requires that property tax assessments reflect "true cash value". The General Property Tax Act defines that term to mean "the usual selling price" of the property.

While actual and reproduction cost are some evidence of value, the constitutional and statutory standard is market-based.

The Tax Tribunal erred in adopting the hearing officer's reasoning that the value should include amounts expended for physical improvements that the hearing officer found were made to enhance the bank's "image" or "business", without regard to whether the expenditures added to the "cash" or "usual selling price" of the property. The law does not tax expenditures that merely enhance the image or business of the owner, only expenditures that add to the cash value or selling price of the property.

It can be anticipated that, if a bank puts fine hardwood and marble throughout a building, those expenditures may not enhance the selling price of the building in an amount equal to their cost. While the expenditures may add to the selling price of the building, they may not add dollar-for-dollar.

A building is sometimes worth less the day after completion of construction than its cost of construction. Ordinarily overimprovements are built by government, not by private entrepreneurs who, in theory at least, would not construct an improvement unless they thought it was worth at least what it cost to build.

The constitution and statute do not authorize a tax on the value of lumber or marble incorporated into a building, but on the market value of the completed structure and land.

We do not hold that the income approach advocated by First Federal's appraiser should govern, nor do we fault the city's appraiser or the Tax Tribunal for *considering* historical cost. Rather, we reject the notion that it is proper to include, in determining value, expenditures made, as the Tax Tribunal found, to enhance plaintiff's image and business without regard to whether they add to the selling

price of the building.

Absent more persuasive evidence, such as comparable sales, historical cost or reproduction cost can be considered in arriving at the usual selling price, but historical or reproduction cost that merely enhances image or business but not selling price is not subject to taxation.

415 Mich. at 704-07, 329 N.W.2d at 757-58.

In notes to the opinion, the court made the following statements:

If the government were to sell an overimprovement to a private person, market price rather than the cost of construction would govern for ad valorem tax purposes. If the government subsidizes a private enterprise in constructing such structures, the market value rather than cost would govern.

This issue can also arise where a private landowner, for personal reasons or simple improvidence, overbuilds for the neighborhood. He constructs a house that costs $150,000 in a neighborhood where all the other houses are worth about $75,000. In the relevant market, the house costing $150,000 may be worth $125,000 or $100,000, but not $150,000. Because it is an overimprovement for the neighborhood, the house, although brand new, should be valued at the market value, not at what it cost.

Merely because the owner may have constructed an improvement that cost more than the improvement is worth on the market should not subject the owner to a higher ad valorem tax.

Even if the structure is not an overimprovement, expenditures on it do not necessarily enhance its value dollar-for-dollar. A greenhouse, a gazebo, a tennis court, or a hot tub, while of value to the owner, do not necessarily add dollar-for-dollar to the usual selling price.

415 Mich. at 706 nn.5-6, 329 N.W.2d at 757 nn.5-6.

The appellant's evidence consisted principally of the testimony of Robert Ogden and Glen Davidson.

Davidson, a resident of Syracuse, Nebraska, and a licensed appraiser with 25 years' experience in the insurance and real estate businesses, estimated that he had sold 200 properties in

the Syracuse area during the last 10 years. He had been a tenant in the bank building, but had moved his office across the street because the upper floor of the bank was not convenient for his customers.

In Davidson's opinion, the property could not be sold for an amount in excess of $200,000 to $250,000.

Ogden is a professional real estate appraiser, whose experience included 4 years in the Lancaster County assessor's office. Ogden's opinion was that functional depreciation should be 40 percent and that the property had a value of approximately $390,000.

In the final analysis, the test is not what factors the assessor considered or failed to consider, but whether the property in question was valued for tax purposes at its actual value. *Airport Inn v. County Bd. of Equalization*, 215 Neb. 659, 340 N.W.2d 378 (1983).

My review of the record convinces me that the appellant in this case satisfied its burden of proof and established that under the Constitution and statutes of this state, and the prior decisions of this court, the board of equalization acted arbitrarily and the appellant was entitled to relief. Upon de novo review, I conclude that the assessed value of the appellant's property should have been reduced to $390,000.

CAPORALE, J., and COLWELL, D.J., Retired, join in this dissent.